**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **Hamilton Jewelry, LLC,** | | |
| **d/b/a/ CF Brandt Jewelers &** | * | |
| **Jewelry Place by the Bay** | | |
| | * | |
| Plaintiff, | | |
| | * | Case No.: 8:20-cv-02248-PWG |
| v. | | Judge Paul W. Grimm |
| | * | |
| **Twin City Fire Insurance** | | |
| **Company, Inc.,** | * | |
| | | |
| Defendant. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION AND ORDER

This insurance coverage case involves a local jeweler's claim for coverage under a business owner's insurance policy for the damages it allegedly sustained as a result of the government-mandated closure of non-essential businesses during the COVID-19 pandemic. Currently pending before this Court are the parties' cross-motions for judgment on the pleadings. I have reviewed the parties' filings and find a hearing unnecessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, Twin City's motion for judgment on the pleadings is GRANTED, and Hamilton's motion for partial judgment on the pleadings is DENIED.

## BACKGROUND

On March 23, 2020, Maryland's Office of the Governor issued an Executive Order requiring the temporary statewide closure of all non-essential businesses in an effort to control the spread of COVID-19 and reduce the accompanying threat to public health, welfare, and safety. ECF 2, Complaint ¶ 27. Plaintiff Hamilton Jewelry, LLC ("Hamilton"), a jewelry store and

showroom located in Upper Marlboro, Maryland, was among the many non-essential businesses that was required to close its doors during the shutdown period. *Id.* ¶¶ 7, 30, 31, 35.

Prior to the COVID-19 pandemic and the resulting closure of non-essential businesses, Hamilton purchased a business owner's policy from Twin City Fire Insurance Company, Inc. ("Twin City") for the policy period commencing May 2, 2019 to May 2, 2020 (the "Policy"). *Id.* at ¶¶ 8–9; ECF 40-7, Policy. The Policy provides coverage for "direct physical loss of or physical damage to Covered Property" that is "caused by or result[s] from a Covered Cause of Loss." Policy at 29. "Covered Cause of Loss" is defined as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is" otherwise excluded or limited by the Policy terms. *Id.* at 30 (capitalization provided by the Policy).

The Policy provides additional coverage for business income that is lost as a result of the necessary suspension of Hamilton's business operations. The Policy provides, in relevant part:

> We will pay for the actual loss of Business Income[1] you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises"[.]
>
> \*\*\*
>
> With respect to the coverage provided in this Additional Coverage, suspension means:
>
> (a) The partial slowdown or complete cessation of your business activities; or
> (b) That part or all of the "scheduled premises" is rendered untentantable [(sic.)] as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.
>
> *Id.* at 38.

---

1    Business Income means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred" and "[c]ontinuing normal operating expenses incurred, including payroll." Policy at 38.

The Policy contains and is modified by an endorsement, captioned "Limited Fungi, Bacteria or Virus Coverage," that provides narrow coverage for certain loss or damage caused by a virus (the "Endorsement"). *Id*. at 123. As relevant here, the Endorsement provides coverage *only* when the damage-causing-virus is the result of a "'specified cause of loss' other than fire or lightning." *Id.* at 124. The "specified cause[s] of loss" are particularly enumerated in the Policy and include "fire, lightning, explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow; ice or sleet; water damage." *Id.* at 53. If the damage-causing virus is the result of a "specified cause of loss," the Endorsement creates coverage only for "direct physical loss or direct physical damage to Covered Property". *Id*. at 124.

The Endorsement expressly *excludes* from coverage:

> loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> (1) Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.
> (2) But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss."

*Id.* at 123.

In March 2020, after ceasing its business operations, Hamilton notified Twin City that it would seek coverage under the Policy for the business income allegedly lost during the government mandated shutdown period. Complaint ¶ 36. Twin City denied Hamilton's claim on March 24, 2020. *Id.* ¶ 37.

On May 20, 2020, Hamilton filed a two-count complaint against Twin City in the Circuit Court for Prince George's County, Maryland. *See generally* Complaint Count I seeks a declaration

that "Maryland's March 23, 2020 Executive Order . . . prohibited Hamilton [] from operating its jewelry stores and showrooms" and that Hamilton's "loss of Business Income is covered under" the Policy. *Id.* 9–11. Count II alleges that by declining coverage for Hamilton's claim for lost business income, Twin City breached the Policy and denied Hamilton coverage in bad faith. *Id.* 11–13. Twin City removed the case to this Court, where the parties agreed to submit cross-motions for judgment on the pleadings under Fed. R. Civ. P. Rule 12(c) solely on the issue of whether the Policy provides coverage for Hamilton's claim. ECF 1, Notice of Removal; ECF 31, Joint Correspondence re: Permission to File Motions.

## STANDARD OF REVIEW

The parties have filed cross-motions for judgment on the pleadings under Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings are subject to the same standards used to evaluate motions to dismiss under Rule 12(b)(6). *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Accordingly, a court evaluating a motion for judgment on the pleadings must assume that the well-pleaded facts alleged in the complaint are true and must draw all reasonable factual inferences in favor of the non-moving party. *Rock for Life-UMBC v. Hrabowski*, 594 F. Supp. 2d 598, 605 (D. Md. 2009); *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Courts may also properly consider documents that have been attached to a 12(c) motion provided it "was integral to and explicitly relied on in the complaint" and if the parties do not challenge its authenticity. *Pulte Home Corp. v. Montgomer Cnty.*, 271 F. Supp. 3d 762, 769–70 (D. Md. 2017). A Rule 12(c) motion should be granted when the pleadings "fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." *Rock for Life*, 594 F. Supp. 2d at 605 (quoting *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 717-18 (E.D. Va. 2000)).

4

**DISCUSSION**

*A.  Standard for interpreting the Policy under Maryland law*[2]

Maryland courts apply general principles of contract interpretation when reviewing and interpreting insurance policies. *Agency Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 998 A.2d 936, 940 (Md. Ct. App. 2010). Accordingly, like other contracts, an insurance policy is to be construed as a whole to determine the parties' intentions, and courts "utilize the law of objective interpretation to ascertain the intent of the contracting parties, provided that intention does not violate an established principle of law." *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 779 A.2d 1061, 1069 (Md. Ct. App. 2001).

Maryland courts "look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage," and interpret policy language according to its "usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Agency Ins. Co.* at 940 (quoting *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387 (2006)). "When the language of a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Mitchell*, 779 A.2d at 1069 (quoting *Wells v. Chevy Chase Bank*, 768 A.2d 620 (Md. 2001)). Maryland courts do not follow the rule applicable in many other jurisdictions that "insurance policies are to be most strongly construed against the insurer," but will nevertheless construe an ambiguous policy term "liberally in favor of the insured and against the insurer *as drafter of the instrument.*" *Connors v. Gov't Emps. Ins. Co.*, 113 A.3d 595, 605 (Md. 2015) (quoting *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002)) (emphasis in original). "A policy

---

[2]      The parties both rely on Maryland law to support their positions.  The Court will do likewise.

term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F. Supp. 3d 462, 467 (D. Md. 2016).

B.  *The Policy excludes damages caused by a virus*

The primary dispute between Hamilton and Twin City is how the Endorsement, which creates narrow coverage for some damages caused by a virus while broadly excluding others, applies to Hamilton's alleged loss of business income during the COVID-19 pandemic. For the reasons explained below, I find that the Endorsement unambiguously excludes Hamilton's alleged damages from coverage under the Policy.

i.  **The doctrine of reasonable expectations is not applicable in Maryland**

Hamilton begins by invoking "the doctrine of reasonable expectations," and argues that the application of that doctrine compels a finding that the Endorsement does not preclude coverage under the Policy. Hamilton states:

> The Fourth Circuit has generally explained: "the doctrine of reasonable expectations is that **the objectively reasonable expectations of applicants** and intended beneficiaries regarding the terms of insurance contracts **will be honored even though painstaking study of the policy provisions would have negated those expectations**." *Burlington Ins. Co. v. Shipp*, [215 F.3d 1317] (4th Cir. 2000).

ECF 40, Pl.. Mot. (emphasis added) at 9.

The Fourth Circuit decision that Hamilton quotes in the excerpt above is an appeal from the Northern District of West Virginia applying West Virginia law—it does not support the application of the "doctrine of reasonable expectations" in Maryland. *See Burlington*, 215 F.3d 1317.

I would generally assume that Hamilton's misstatement of the applicable law was simply an oversight. But that assumption is somewhat challenged when, later in its brief, Hamilton more

affirmatively states that "Maryland adheres to the doctrine of the policyholder's objectively reasonable expectations," this time citing a Fourth Circuit ERISA decision applying North Carolina law and federal common law, which also do not apply in this Maryland case. Pl. Mot. at 20 (citing *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 2013)).

Hamilton's "reasonable expectations" argument fares no better when it cites Maryland law in support. *First*, Hamilton cites *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 862 (Md. 1995), in which the Maryland Court of Appeals addresses an insurer's duty to defend under the terms of a general liability policy.  The court parenthetically quotes a law review article, which provides that, to determine the intent of the parties to an insurance contract, "the courts consider the reasonable expectations of the insured." *Id. Second*, Hamilton cites *Liberty Mut. Ins. Co. v. Craddock*, 338 A.2d 363, 375 (Md. Ct. App. 1975), in which the Maryland Court of Special Appeals, in the process of determining whether certain policy language was ambiguous, noted that the insured had a "reasonable expectation" that the policy terms allowed him to move from state to state without extinguishing coverage.

Neither of the decisions Hamilton cites invoke the "doctrine of reasonable expectations," and neither stands for the proposition that an insured's reasonable expectations "will be honored even though painstaking study of the policy provisions would have negated those expectations." Pl. Mot. at 9 (quoting *Burlington*, 215 F.3d at 1317). To the contrary, under Maryland law "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Maryland Cas. Co. v. Blackstone Int'l Ltd*., 114 A.3d 676, 681 (Md. 2015).[3]

---

[3]     *See Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 685–86 (D. Md. 2013) ("[The Plaintiff] relies exclusively on citations to West Virginia case law interpreting

In short, Hamilton does not cite, and I have not found, any Maryland case law applying the doctrine of reasonable expectations.[4] Accordingly, my analysis of the Endorsement's application begins with its plain language.

### ii.     The Endorsement is unambiguous

The Endorsement provides, under the heading "Fungi, Bacteria or Virus Exclusions" that Twin City "will not pay for any loss or damage caused directly or indirectly by . . . [p]resence, growth, proliferation, spread or any activity of . . . virus." Policy at 123. It also provides that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.*

Maryland law compels this Court to analyze the Endorsement, and the Policy as a whole, "according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay-person would understand them to mean." *Universal Underwriters Ins. Co.*, 761 A.2d 997, 1005 (Md. Ct. App. 2000) (quoting *Kendall v. Nationwide Ins. Co.*, 702 A.2d 767 (Md. 1997)).. Courts can look outside the Policy only if its terms are ambiguous, *i.e.*, susceptible to more than one meaning from the perspective of a reasonably prudent lay-person. *Id.*

Twin City argues that the exclusionary language unambiguously excludes coverage for business income that was lost as a result of the COVID-19 pandemic. ECF 42, Opposition at 9. Hamilton disagrees, and seems to argue that due to such factors as the title of the Endorsement ("Limited Fungi, Bacteria or Virus Coverage"), its layout, and the fact that it has a separate $50,000 limit, a reasonably prudent policyholder would understand the Endorsement to cover Hamilton's

---

the reasonable expectations doctrine. As discussed above, however, the evidence is clear that Maryland law governs the interpretation of the Policy.").

[4]     Furthermore, under West Virginia law, the doctrine applies only upon a threshold finding of ambiguity except in "extremely limited" circumstances." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 63 (W.V. Ct. App. 2010).

claim.[5] Pl. Mot. at 19–21. That is not a reasonable reading of the Endorsement or the Policy as a whole.

Courts around the country have already had occasion to review insurance policies including the same or substantially similar exclusionary language in the context of COVID-19 related business income or business interruption claims. Those courts have almost[6] universally concluded that the applicable virus exclusions unambiguously bar coverage for COVID-19 related claims for lost income. *See, e.g., Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 488 F. Supp. 3d 904, 907 (N.D. Cal. 2020) ("Sentinel has met its burden of proving that the Virus Exclusion applies to Plaintiffs' allegations of coverage."); *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, 499 F. Supp. 3d 74, 80 (D.N.J. 2020) ("Moreover, a survey of the case law on this issue reveals that federal courts interpreting virtually identical 'Virus Exclusions' have nearly unanimously determined that these exclusions bar coverage of similar claims.") (collecting cases); *Raymond H Nahmad DDS PA v. Hartford Cas. Ins. Co.*, 499 F. Supp. 3d 1178, 1190 (S.D. Fla. 2020) (collecting cases); *Wilson v. Hartford Cas. Co.*, 492 F. Supp. 3d 417, 427 (E.D. Pa. 2020).

---

[5]     It is not entirely clear in Hamilton's brief whether it argues that the Endorsement's alleged ambiguity *creates* coverage, or simply that it does not *exclude* coverage that exists elsewhere in the Policy.

[6]     I am aware of two decisions that reach a different conclusion.  The Court in *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co., Ltd.*, 489 F. Supp. 3d 1297, 1302 (M.D. Fla. 2020) denied the insurer's motion to dismiss under Rule 12(b)(6) because "several arguably ambiguous aspects of the Policy make determination of coverage inappropriate at this stage."   A primary reason for the court's decision was that a complete copy of the relevant policy was not attached to the pleadings.  *Id.*  Here, the parties have provided the Policy in its entirety and I have reviewed the Endorsement in that context. The second such decision, *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360 (E.D. Va. 2020) has been characterized by other federal courts as a "notable outlier."  *See, e.g., Bluegrass, LLC. v. State Auto. Mut. Ins. Co.*, No. 2:20-CV-00414, 2021 WL 42050, at *4 (S.D.W. Va. Jan. 5, 2021).

Hamilton's claim falls squarely within the exclusionary terms of the Endorsement, which unambiguously bars coverage for loss or damage arising out of a virus. Accordingly, consistent with the findings of the overwhelming majority of courts, I find that the Endorsement bars coverage for Hamilton's claim for business income[7] lost as a result of COVID-19.

### iii.   Hamilton's claim does not fall within the narrow coverage grant in the Endorsement.

Hamilton asserts next that its claim falls within the Endorsement's coverage grant for loss or damage that is caused by a virus, when that virus is, in turn, caused by a "specified cause of loss." Pl. Mot. at 24–27; Policy at 124. Here, Hamilton alleges the virus arose out of a "civil commotion," namely the "members of the public revolt[ing] against the closures, risking potential additional infections." Pl. Mot. at 26. This argument is too clever by half.

"Civil commotion" is not defined in the Policy. Courts have variously defined the term as "essentially a kind of domestic disturbance . . . such as occur among fellow-citizens or within the limits of one community. . . . For there to be a civil commotion, the agents causing the disorder must gather together and cause a disturbance and tumult," *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1466–67 (S.D.N.Y. 1983), and as an "'uprising among a mass of people which occasions a serious and prolonged disturbance and an infraction of civil order, not attaining the status of war or an armed insurrection. A civil commotion requires the wild or irregular action of

---

[7]     Hamilton also claims coverage for "Extra Expense," an additional coverage under the Policy, which covers "reasonable and necessary Extra Expense" incurred during the "'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage" to the insured's covered property. Pl. Mot. at 13; Policy at 38. "Extra Expense[s]" are those incurred "to avoid or minimize the suspension of business," to "continue 'operations'" and to repair or replace any property. Policy at 38. Hamilton alleges no facts in support of its claim for "Extra Expense" coverage. *See generally* Complaint; Pl. Mot. Furthermore, any existing "Extra Expenses" would be excluded by the Endorsement.

many persons assembled together." *Hartford Fire Ins. Co., Hartford, Conn., v. War Eagle Coal Co.*, 295 F. 663, 665 (4th Cir. 1924).

Except to assert in conclusory fashion in its complaint that COVID-19 "was and is being spread as a result of, *inter alia,* civil commotion in March 2020 and thereafter," Hamilton has not pleaded any facts indicating that a civil commotion was the cause of the virus that led to its alleged loss. Complaint ¶ 28. Instead, Hamilton attaches two news articles as exhibits to its brief that describe public protests and police response to violations of the Governor's shutdown order. Pl. Mot. Exh. O and P. Leaving aside the question of whether the events described in those articles rise to the level of "civil commotion," it is not clear as a matter of logic how protests in response to the Governor's shutdown order could have resulted in the virus that the shutdown orders were issued to control. In other words, Hamilton appears to have it backwards—the virus resulted in the alleged "civil commotion," not the other way around. And only the former falls under the Endorsement's limited coverage grant.

Finally, coverage for loss or damage caused by a virus that arises out of a "civil commotion" is limited to "*direct physical* loss or *direct physical* damage" to covered property. Policy at 124 (emphasis added). As explained in Section C, *below*, Hamilton did not suffer direct physical loss or direct physical damage.

iv.     **Hamilton's damages were caused by a virus**

Hamilton argues next that the "mandatory closure of its operations . . . [was] solely a result of the Executive Orders of the Governor," and that the Endorsement therefore does not apply to

its claim. Pl. Mot. at 22.[8] The Endorsement excludes from coverage "loss or damage caused *directly or indirectly*" by a virus. Policy at 123 (emphasis added).

As a general matter, Maryland courts apply the "efficient proximate cause rule" to determine the cause of a loss under an insurance contract. *See Hartford Steam Boiler Inspection & Ins. Co. v. Henry Sonneborn & Co.*, 54 A. 610, 612 (1903). But if parties agree to exclude losses by a particular cause, they may do so through the use of an exclusion that is "conspicuously, plainly, and clearly set forth in the policy." *Megonnell,* 796 A.2d at 772. "Where the insurer properly and unambiguously uses language in its exclusion, the clear and specific terms must be enforced since the insurer cannot be held liable for risks it did not assume." *Id.* Exclusionary language that bars coverage for damages caused even in part by an excluded risk is commonly referred to as an anti-concurrent causation clause.

The Maryland Court of Appeals has not opined on the application of an anti-concurrent causation clause in the context of a first-party insurance coverage dispute. In *Bao v. Liberty Mutual Fire Insurance Co.*, 535 F. Supp. 2d 532, 540 (D. Md. 2008), however, Judge Fredrick Motz of this Court reviewed extra-jurisdictional authority and analogous decisions by the Maryland Court of Appeals and concluded that the Maryland high court "would not apply the efficient proximate cause rule, but would instead follow the plain language of the concurrent causation clause in the policy's exclusion." My colleague Judge Ellen Hollander subsequently observed that Judge Motz's reasoning in *Bao* is "consonant with the Maryland Court of Appeal's clear directive to apply the

---

[8]     Hamilton also appears to argue that the Endorsement does not apply because "COVID-19 is actually a disease, ***not a virus***," and urges this Court to take judicial notice of that fact. Pl. Mot. at 23–24 (emphasis in original). This argument is difficult to take seriously while we remain in the throes of a global pandemic caused by SARS-CoV-2, also known as the novel corona***virus.*** Furthermore, this argument directly contradicts Hamilton's repeated assertions elsewhere in its brief and in its complaint that COVID-19 is a virus. *See, e.g.,* Complaint ¶ 1; Pl. Mot. at 22.

terms of the insurance contract, *Bausch & Lomb*, 330 Md. at 779, 625 A.2d at 1031, and its refusal to import tort law principles to the interpretation of insurance contracts." *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. CV ELH-18-3918, 2020 WL 1063060, at *16 (D. Md. Mar. 5, 2020), *reconsideration denied*, No. CV ELH-18-3918, 2020 WL 7054760 (D. Md. Dec. 2, 2020). I agree with my colleagues' conclusion that anti-concurrent causation clauses, such as that in the Endorsement, are enforceable under Maryland law.

"Courts that have considered whether the virus exclusion applies where government closure orders themselves rather than the virus are alleged to be the cause of plaintiff's business losses, have rejected" arguments like Hamilton's and concluded that the virus exclusions nevertheless bar coverage. *Raymond H Nahmad DDS PA v. Hartford Cas. Ins. Co.*, 499 F. Supp. 3d 1178, 1189 (S.D. Fla. 2020) (collecting cases); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020) ("While the Orders technically forced the Properties to close to protect public health, the Orders only came about sequentially as a result of the COVID-19 virus spreading rapidly throughout the community. Thus, it was the presence of COVID-19 . . . that was the primary root cause of Plaintiffs' businesses temporarily closing."); *Seifert v. IMT Ins. Co.*, 495 F. Supp. 3d 747, 753 (D. Minn. 2020) ("[the insured] alleges that his business losses are the direct and proximate result of 'Governmental Pandemic Closure Orders; orders that have been put in place in an effort to control the spread of the COVID-19 Pandemic.' Pursuant to the anti-concurrent loss provision, if a virus is any part of the causal chain causing a loss, then the loss is not covered.").

The same result is compelled here where the Endorsement unambiguously excludes from coverage virus-related losses "regardless of any other cause or event that contributes concurrently or in any sequence to the loss," Policy at 123. The executive orders requiring Hamilton's temporary

13

closure were expressly issued in response to the spread of COVID-19 in Maryland. Complaint ¶ 27. Hamilton's claim is therefore excluded by the plain language the Endorsement despite the fact that the most immediate cause of Hamilton's closure was the Governor's March 23, 2020 executive order.[9; 10]

### C. The Policy only covers physical loss or physical damage to property

In addition to excluding coverage for loss or damage arising out of a virus, coverage under the Policy is limited to "direct physical loss or physical damage" to covered property. Policy at 29. Similarly, the Policy's additional coverage for business income is limited to "the actual loss of Business Income" sustained "due to a necessary suspension of" business operations that is caused by "*direct physical* loss of or *direct physical* damage to" property on Hamilton's premises. *Id.* at 38 (emphasis added). Hamilton argues that its claim for lost business income falls within this coverage grant because "direct physical loss or physical damage" encompasses the loss of use even in the absence of physical injury to the property itself. Pl. Mot. at 13–16. I disagree.

This Court has concluded in at least two prior COVID-19 related cases that lost business income or loss of use of property do not constitute "physical loss" or "physical damage."

In *Cordish v. Affiliated EM Ins. Co.*, Judge Hollander concluded that "[t]he term 'physical,' as used in the Policy, clearly indicates that the damage must affect the good itself, rather than the Plaintiff's use of that good. . . . ***Indeed, physical damage is a distinct, demonstrable, physical***

---

[9]     The parties also dispute whether the government shutdown orders constitute a "covered cause of loss" under the Policy.  Because I conclude that the Endorsement excludes coverage regardless, I need not reach this question.

[10]     In its opening brief, Twin City theorizes that Hamilton wrongly bases its theory for coverage on the Policy's "Civil Authority" provision, which extends coverage when an insured is prevented from accessing its covered property by a government authority due to damage to neighboring property. Opp. at 13–15; Policy at 39. Because Hamilton appears to agree that the "Civil Authority" provision is inapplicable here, I will not address that argument. ECF 43, Pl. Reply at 9.

***alteration of the property. Direct physical loss occurs when a structure has been rendered uninhabitable and unusable***. Economic loss alone is not sufficient to trigger coverage; physical alteration to the property is necessary." No. CV ELH-20-2419, 2021 WL 3883595, at *14 (D. Md. Aug. 31, 2021) at *14 (internal quotations and citations omitted) (emphasis added).

Judge Bennett reached the same conclusion in *Bel Air Auto Auction, Inc. v. Great N. Ins. Co.*, No. CV RDB-20-2892, 2021 WL 1400891, at *12 (D. Md. Apr. 14, 2021). He summarized: "Quite simply, this Court is unpersuaded that the COVID-19 virus in some way physically altered [the insured's] covered properties or the surrounding areas in a manner that triggers coverage under the plain language of the Policy. A mere loss of use of property is not 'physical damage' within the meaning of Maryland law." *Id.* (emphasis added).

Courts around the country likewise have concluded that policies that cover only physical loss or physical damage do not provide coverage for business income or business interruption claims arising out of COVID-19 and/or the resulting government shutdown of non-essential businesses. The District of Kansas has aptly stated:

> [T]he overwhelming majority of cases to consider business income claims stemming from COVID-19 with similar policy language hold that "direct physical loss or damage" to property requires some ***showing of actual or tangible harm to or intrusion on the property itself***.
>
> ***
>
> The presence of the words "direct" and "physical" limit the words "loss" and "damage" and unambiguously require that the loss be directly tied to a material alteration to the property itself, or an intrusion onto the insured property.63 The Court follows the majority of courts to consider identical policy language in the context of COVID-19 and holds that direct physical loss or damage to the property requires a tangible, actual change to or intrusion on the covered property.

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1201–02 (D. Kan. 2020) (collecting cases) (emphasis added).

Hamilton principally relies on *National Ink & Stitch, LLC, v. State Auto Property & Casualty Insurance Co.*, 435 F. Supp. 3d 679, 680 (D. Md. 2020), for the proposition that "direct physical loss" or "direct physical damage" encompasses "the loss of use of property that was not physically destroyed." Pl. Mot. at 13. But *National Ink* is distinguishable.

*National Ink* is not a COVID-19 case. The insured in *National Ink* case sought coverage for damage allegedly sustained to its computer system in a ransomware attack, specifically the loss of data and software and the loss of computer system functionality. *Id.* at 680–81.

Additionally, *National Ink* analyzes meaningfully different policy language. The policy in *National Ink* covered "physical loss or damage" as opposed to "physical loss or *physical* damage." *Id.* Perhaps more significantly, the policy in *National Ink* covered "physical loss of or damage to Covered Property," and expressly defined "Covered Property" to include software and stored data. *Id.* Accordingly, I do not find *National Ink* persuasive in this case.

Hamilton also cites two COVID-19 cases where the courts concluded that policies similar to Hamilton's *did* provide coverage for an insured's loss of business income due to the virus and the related government shutdowns. In *Elegant Massage, LLC v. State Farm Mutual Auto Insurance, Co.*, 506 F. Supp. 3d 360 (E.D. Va. 2020), the Eastern District of Virginia concluded that the array of interpretations of "direct physical loss" under Virginia law rendered the policy language ambiguous.  The court therefore construed the policy in favor of the insured. *Id.* The Superior Court for the State of North Carolina reached the same conclusion under North Carolina law in *North State Deli, LLC v. The Cincinnati Insurance Company*, Case No. 20 CVS 02569 (N.C. Sup. Ct. Oct. 7, 2020).

The cases Hamilton cites are clear outliers[11] that do not meaningfully weigh against the overwhelming authority[12] that supports the conclusion that "direct physical loss or direct physical damage" requires a showing of "actual or tangible harm to or intrusion on the property itself." *Promotional Headwear*, 504 F. Supp. 3d at 1201–02. And, in any event, they are not binding on this Court, and I find them to be unpersuasive in light of the far more numerous and better reasoned decisions that I have referenced above. Because Hamilton has not demonstrated that its covered property suffered tangible, physical damage, its claims are not covered under the Policy.

   D.  *Twin City did not breach the Policy*

For the reasons explained above, I conclude that the Policy does not provide coverage for Hamilton's claim for business income that was lost as a result of the COVID-19 pandemic or the related government closure of non-essential businesses. And because Hamilton's claims are not covered, Twin City has not breached the Policy.

---

[11]    *See Bluegrass, LLC. v. State Auto. Mut. Ins. Co.*, No. 2:20-CV-00414, 2021 WL 42050, at *4 (S.D.W. Va. Jan. 5, 2021) (describing *Elegant Massage* as a "notable outlier.").
[12]    Twin City cites at least eleven cases in its Opposition that "have found no direct physical loss in COVID-19 business interruption cases like this one." Opp. at 18.  Since filing its Opposition, Twin City has submitted seven notices of supplemental authority to this Court, ECF 45–51, citing well over 50 additional cases, the majority of which appear to have reached the same conclusion.

**ORDER**

For the foregoing reasons,

1.  The Motion for Partial Judgment on the Pleadings by Hamilton Jewelry, LLC, ECF 38, is DENIED;

2.  The Rule 12(c) Motion for Judgment on the Pleadings by Twin City Fire Insurance Company, ECF 41, is GRANTED.

Dated: September 16, 2021                          _____/S/_____
                                                   Paul W. Grimm
                                                   United States District Judge